UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MERLE NORFLET, AS FIDUCIARY OVER :
THE  PERSON AND ESTATE OF MAGGIE :
NORFLET, ON BEHALF OF HERSELF AND :
ALL OTHERS SIMILARLY SITUATED, :
  PLAINTIFF, : Civil No. 3:04cv1099 (JBA)
          :
v. :
          :
JOHN HANCOCK FINANCIAL SERVICES, :
INC., AND JOHN HANCOCK LIFE :
INSURANCE COMPANY, :
  DEFENDANTS. :

**RULING ON DEFENDANT'S MOTION TO DISMISS [DOC. # 25]
AND MOTION FOR PROTECTIVE ORDER [DOC. # 35]**

   Plaintiff Merle Norflet, as fiduciary for her mother Maggie Norflet, filed a putative class action complaint [Doc. # 1] on July 7, 2004, alleging that defendants John Hancock Financial Services, Inc., and John Hancock Life Insurance Company (collectively, "Hancock"), discriminated against plaintiffs and other African Americans by steering them toward purchasing substandard life insurance policies, while white customers were generally offered more favorable policies.  An Amended Complaint [Doc. # 24] was filed May 16, 2005, and states four counts: racial discrimination in the formation, performance, and terms of life insurance contracts, in contravention of 42 U.S.C. § 1981 (Count One); racial discrimination with respect to personal property, in contravention of 42 U.S.C. § 1982 (Count Two); a claim for declaratory and injunctive relief seeking to enjoin

1

Hancock from collecting premiums on the allegedly discriminatory policies and seeking disgorgement or recissionary relief (Count Three); and a claim for unjust enrichment and imposition of a constructive trust (Count Four).  Before the Court is Hancock's motion [Doc. # 25] to dismiss the complaint for lack of standing and to dismiss the equitable counts for failure to state a claim on which relief can be granted.  For the reasons that follow, defendant's motion is denied.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff's Amended Complaint alleges the following facts, which will be accepted as true for purposes of this motion.  In 2002, the Connecticut probate court appointed plaintiff as the conservator for her mother, Maggie Norflet, who "is incapacitated and resides alone at a ... convalescence home."  Am. Compl. ¶ 8. Maggie Norflet purchased and owns two Hancock insurance policies, and inherited a third from her daughter, Pearl Norflet, which she also continues to own.  Id. ¶ 9.  Plaintiff alleges that these policies were issued on discriminatory terms.  Plaintiff distinguishes between "ordinary" life insurance policies, which she defines as "traditional whole life policies with paid up additional riders," and "substandard policies" such as "industrial life," "industrial weekly" and "burial" life insurance policies.  Id. ¶ 2.  The substandard policies, plaintiff alleges, have relatively low face values yet are more

expensive than ordinary policies over the long term.  Id. ¶¶ 2,
12.  Holders of the substandard policies were "effectively doomed
to pay premiums over their anticipated life expectancy that would
greatly exceed the face value of the policies by significant
amounts," id. ¶ 16, thereby generating large profits for Hancock.
These policies allegedly were marketed disproportionately to
African Americans.  Specifically, plaintiff alleges that:

> 12.  At all times material hereto, Hancock either
> refused to service African Americans altogether or
> maintained a deliberate company-wide practice of
> steering African Americans to its inferior and more
> expensive Substandard policies.  Hancock, for instance,
> employed a practice of inducing its sales force to
> offer to African-Americans primarily Substandard
> policies rather than the Ordinary policies routinely
> offered to Caucasians.

> 13.  Upon information and belief, Hancock perpetuated
> this discriminatory scheme by tending not to pay
> commissions to its agents and sales force for sale of
> Ordinary insurance policies to African-Americans and
> instead by tending to pay commissions on the sale of
> the Substandard policies at issue in this litigation.
> In addition, as further financial incentive to sell
> Substandard policies to African-Americans, Hancock paid
> its agents a commission for collecting the weekly
> premiums from its insureds--a "collection fee."

> 14.  In its actions, and in steering its sales force
> only to sell inferior products to African-Americans,
> Hancock knew that it targeted disadvantaged, low-income
> African-Americans, who were unsophisticated with
> respect to life insurance matters. ...

Am. Compl. ¶¶ 12-14.

Plaintiff further alleges that when Hancock "demutualized"
in 2000, it gave holders of substandard policies fewer shares of
stock and thus has paid them less in dividends compared to owners

of ordinary policies, who were more likely to be Caucasian.  Id. ¶ 23.

Finally, plaintiff alleges that Hancock has discriminated against holders of the substandard policies by "defective record-keeping practices" that have resulted in failure to make timely payments of death benefits and failure to provide copies of policies when requested.  Id. ¶ 22.

On September 30, 2004, Hancock answered the complaint, denying the allegations and asserting a number of affirmative defenses.  See Answer [Doc. # 16].  Thereafter, this case was stayed for approximately six months.  See [Docs. ## 18, 20].  After the stay was lifted, plaintiff's Amended Complaint was filed May 16, 2005, and defendant's motion to dismiss was filed May 26, 2005.

## II.  STANDARD

At the pre-filing conference, Hancock characterized its motion as one for judgment on the pleadings under Rule 12(c), because it already had answered the original complaint.  See Tr. of Tel. Status Conference, 4/21/05, at 2.  Thereafter, plaintiff filed an Amended Complaint and defendant styled its motion to dismiss as a Rule 12(b)(1) and (6) motion.[1]

---

[1]Some courts have held that, in such a procedural posture, the correct motion is still one for judgment on the pleadings under Rule 12(c).  See Ketterman v. City of N.Y., No. 00 Civ. 1678(NRB), 2001 WL 579757, at *5 (S.D.N.Y. May 30, 2001); Pine v. Shell Oil Co., Civ. A. No. 92-0346B, 1993 WL 389396, at *1

A.    **Subject Matter Jurisdiction**

Whether defendant's motion is brought under Rule 12(b) or 12(c) does not affect the standard employed.  Rule 12(h)(3) provides that the issue of the Court's subject matter jurisdiction may be raised at any time:  "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  In this case, defendant has characterized the motion as one under Rule 12(b)(1), but "[t]he distinction between a Rule 12(h)(3) motion and a Rule 12(b)(1) motion is simply that the former may be asserted at any time and need not be responsive to any pleading of the other party.  For purposes of this case, the motions are analytically identical because the only consideration is whether subject matter jurisdiction arises." Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 879 n.3 (3d Cir. 1992) (internal citation omitted).

"A case is properly dismissed for lack of subject matter jurisdiction ... when the district court lacks the statutory or constitutional power to adjudicate it."  Makarova v. United

_____

(D.R.I., Aug. 23, 1993).  Others have permitted a Rule 12(b)(6) motion at this stage, before the defendant has answered the amended complaint. See Wright v. Int'l Bus. Mach. Corp., 796 F. Supp. 1120 (N.D. Ill. 1992); see also Mercury Mall Assocs., Inc. v. Nick's Market, Inc., 368 F. Supp. 2d 513, 517 (E.D. Va. 2005) ("Though the pleadings are closed, Rule 12(h)(2) allows a defendant to raise the defense of failure to state a claim upon which relief can be granted.").

<u>States</u>, 201 F.3d 110, 113 (2d Cir. 2000).  In resolving a motion to dismiss for lack of subject matter jurisdiction, the court may refer to evidence outside the pleadings.  <u>Id.</u>  Evidence concerning the court's jurisdiction "may be presented by affidavit or otherwise." <u>Kamen v. American Tel. & Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986).  A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.  <u>Makarova</u>, 201 F.3d at 113; <u>see also</u> <u>Malik v. Meissner</u>, 82 F.3d 560, 562 (2d Cir. 1996) ("The burden of proving jurisdiction is on the party asserting it.").

**B.   Failure to State a Claim**

The "standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." <u>Patel v. Contemporary Classics of Beverly Hills</u>, 259 F.3d 123, 126 (2d Cir. 2001) (citations omitted).  "In both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor.  The court will not dismiss the case unless it is satisfied that the complaint cannot state any set of facts that would entitle him [or her] to relief." <u>Id.</u> (citations omitted).

To survive the motion, the plaintiff must set forth "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the

grounds upon which it rests." <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ. P. 8(a)(2)); <u>see also</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).

## III. DISCUSSION

### A.   Standing

Hancock argues that the complaint should be dismissed for lack of subject matter jurisdiction because plaintiff lacks standing to assert claims against Hancock.  In particular, defendant argues that plaintiff does not state facts sufficient to conclude that her injury, if any, is "'fairly traceable' to John Hancock's alleged discriminatory steering," because plaintiff does not "allege that Maggie was in a position to obtain Ordinary life insurance (<u>i.e.</u>, that the Norflets could have afforded these policies)."  Def. Mem. of Law in Support of Mot. to Dismiss [Doc. # 26] at 10.  The Norflets respond that the injury they claim is not inferior life insurance itself, but discrimination in the manner in which insurance was offered, <u>i.e.</u>, being "treated differently from white customers because of her race when she purchased insurance."  Pl. Mem. in Opp. [Doc. #

30] at 14.  This injury, they argue, is directly traceable to Hancock since Hancock sold Maggie and Pearl Norflet the insurance policies.  Id.

Because Article III of the Constitution "confines the judicial power of the federal courts to deciding cases or controversies," standing is a prerequisite for a party to invoke federal subject matter jurisdiction.  Fulani v. Bentsen, 35 F.3d 49, 51 (2d Cir. 1994); see also Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").  "To have standing, a plaintiff must '[1] allege personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief.'"  Fulani, 35 F.3d at 51-52 (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).  The first element, actual injury, requires "an invasion of a legally protected interest that is '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'"  Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 663 (1993) (quoting Lujan, 504 U.S. at 560)).  The second element, causation, requires "a causal relationship between the injury and the challenged conduct," which the Supreme Court has defined to mean that "the injury 'fairly can be traced to the challenged action of the

defendant,' and has not resulted 'from the independent action of some third party not before the court.'" Id. (quoting Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976)).  The third element, redressability, means that the "'prospect of obtaining relief from the injury as a result of a favorable ruling' is not too speculative.'"  Id. at 663-64 (quoting Allen, 468 U.S. at 752)).

"The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561.  However, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." Id. (internal quotation marks, alteration and citation omitted).

The outcome of the standing analysis often depends on how one characterizes a plaintiff's claim.  See Northeastern Florida, 508 U.S. at 668 (comparing cases); Fulani, 35 F.3d at 52 (stating that characterizing plaintiff's injury is not "a mechanical exercise.") (internal quotation marks and citation omitted). Plaintiff argues that the alleged injury is that "pursuant to Defendants' company policy or practice, [her mother was] treated differently from white customers because of her race when she purchased insurance." Pl. Mem. in Opp. at 14.  In contrast,

Hancock argues that plaintiff's claimed injury actually is "her mother's alleged inability to obtain" a better life insurance policy.  Def. Reply [Doc. # 31] at 4.

These conflicting characterizations draw on a distinction established in Supreme Court Equal Protection case law between claims alleging a racial barrier to competition for a benefit, and those alleging failure to obtain the benefit itself. For example, in <u>Northeastern Florida</u>, the Supreme Court held that a plaintiff had standing to challenge a city government's minority-business set-aside contracting policy, even if the plaintiff could not establish that it would have received the contract absent the policy:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

<u>Northeastern Florida</u>, 508 U.S. at 666.  Thus, to establish standing to challenge the set-aside program, the plaintiff contractors' association only needed to "demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis."  <u>Id.</u>[2]  In

---

[2]In reaching this conclusion, the Supreme Court relied on three prior cases.  First, <u>Turner v. Fouche</u>, 396 U.S. 346 (1970),

Gratz v. Bollinger, 539 U.S. 244, 262 (2003), a rejected white
applicant for an undergraduate slot at the University of Michigan
had standing because he "alleged that the University had denied
him the opportunity to compete for admission on an equal basis"
and "that he was 'able and ready' to apply as a transfer student
should the University cease to use race in undergraduate
admissions."  Thus the plaintiff's alleged injury was not too
speculative because he stood ready to reapply if his application
would be considered on an equal basis with others.  Id.  While
the plaintiff did allege that a minority student with his
qualifications would have been admitted, he was not required to
allege that he himself would have been admitted; he was merely

_____

held that a plaintiff who did not own property had standing to
challenge a state law limiting school board membership to
property owners, and the "holding did not depend upon an
allegation that [the plaintiff] would have been appointed to the
board but for the property requirement.  All that was necessary
was that the plaintiff wished to be considered for the position."
Northeast Florida, 508 U.S. at 664.  Second, the Court held in
Clements v. Fashing, 457 U.S. 957 (1982), that plaintiffs who
alleged a desire to run for higher office had standing to
challenge a Texas law requiring them to resign from public office
upon their announcement of a candidacy for another office, even
though there was no allegation that they would actually have been
elected to the new positions.  Third, in Regents of the
University of California v. Bakke, 438 U.S. (1978), the injury
alleged was that a white applicant could not be considered for a
seat at a public medical school that was set aside for minority
applicants.  Writing for a majority on this point, Justice Powell
held that the plaintiff was not required to allege that he
actually would have been admitted in the absence of the
affirmative action program, only that he suffered discrimination
when he was not able to be considered for all 100 spots in the
class.

required to allege that he desired to compete for membership in the class.  Id.

In contrast, Warth v. Seldin, 422 U.S. 490, 504 (1975), on which Hancock relies, held that plaintiffs who challenged a zoning ordinance with allegedly racially discriminatory impact lacked standing to pursue their claims because they failed to allege that any prospective low- to moderate-income housing projects into which they desired to move had been rejected by the town due to the challenged zoning restrictions.  The Supreme Court held that the plaintiffs "must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a substantial probability that they would have been able to purchase or lease in [the town] and that, if the court affords the relief requested, the asserted inability of petitioners will be removed."  Id.  The petitioner's complaint had challenged "enforcement of the ordinance against third parties - developers, builders, and the like," but failed to allege that these third parties actually had applied for and been denied a zoning variance for a project in which the plaintiffs could have afforded to lease or buy housing.  Id. at 505-06.

In Northeastern Florida, 508 U.S. at 668, the Supreme Court recognized "some tension between Warth" and its other standing decisions.  It distinguished Warth from the minority contracting

12

set-aside because the Warth plaintiffs challenged the outcome of
the zoning process, i.e., the failure to grant variances and
permits, as opposed to the ability "to compete for variances and
permits on an equal basis."  Id.  Thus, for their challenge to
succeed, the Warth plaintiffs needed to allege that absent the
asserted discrimination, they would have succeeded in obtaining
housing in the town.

While Warth presented circumstances concerning the actions
of third parties, in Fulani, 35 F.3d at 54, the Second Circuit
also held that a plaintiff who alleged exclusion from a benefit,
rather than inability to compete for a benefit, was required to
show that she actually would have obtained the benefit in order
to have standing.  Fulani held that a minor presidential
candidate lacked standing to sue the I.R.S. for revocation of the
tax-exempt status of the League of Women Voters, which co-
sponsored a debate from which the candidate was excluded, because
the news network CNN also had co-sponsored the debate, and would
have held the debate and excluded the plaintiff as a non-
"significant" candidate regardless of the League's involvement.
Fulani, 35 F.3d at 52-53.  Because she would have been excluded
anyway, her claim was not redressable through the relief sought.
Id. at 54.  Furthermore, unlike the Northeastern Florida
plaintiffs, "Fulani was considered by the League for inclusion in
the Debate, but was ultimately excluded" due to her lack of

public support.  <u>Id.</u>[3]

Hancock argues that plaintiff's allegations are analogous to <u>Fulani</u> and <u>Warth</u> because she fails to allege facts showing that her mother would have been able to obtain an "ordinary" life insurance policy, and she may not have been eligible for such a policy due to economic circumstances entirely unconnected to Hancock's alleged discriminatory actions.[4]  This argument does not properly consider the nature of the harm plaintiff alleges, <u>i.e.,</u> barriers to equal opportunity to choose.  Plaintiff alleges that her mother was "steered" to a "substandard" policy because of her race.  Construing all allegations in plaintiff's favor, as the Court must at this stage, the complaint alleges that her mother's race was the deciding factor in determining which policy or policies Hancock offered or discussed with her.  In other words, the complaint alleges that, due to her race, Maggie

---

[3]<u>See also</u>, <u>e.g.</u>, <u>Wilson v. Glenwood Intermountain Props.</u>, 98 F.3d 590, 593 (10th Cir. 1996) (plaintiffs claiming Fair Housing Act violations by property owners who, in conformance with an agreement with Brigham Young University, advertised rental properties exclusively for either male or female students lacked standing because they were not BYU students and therefore they failed to meet another legitimate, non-discriminatory requirement for obtaining the desired housing, and their gender discrimination claim was not redressable through a favorable decision on their Fair Housing Act complaint).

[4]While defendant points to the allegations of the complaint that plaintiff Merle Norflet subsists on a "modest income," <u>see</u> Am. Compl. ¶7, the relevant inquiry would be the financial status of her mother Maggie Norflet, about which the complaint is silent.

Norflet was not given full information and therefore was unable to evaluate, on an equal footing with white applicants, which policy was best for her.

This case appears more analogous to Comer v. Cisneros, 37 F.3d 775, 791 (2d Cir. 1994), where certain plaintiffs alleged that a municipal housing authority discriminated against them in violation of the Equal Protection Clause and several federal statutes in administering the Section 8 housing subsidy program. One representative plaintiff alleged that "[s]he applied for public housing, but received only the information that the administrators chose to share with her.  She alleges that she did not know that she could use her voucher to move outside the city limits.  Furthermore, [she] contends that [the defendant's] rules and regulations, in their administration, violate the Constitution because they erect a barrier that makes it more difficult for economically disadvantaged blacks to obtain a housing benefit than it is for non-minorities." Id. (emphasis in original).  The Second Circuit held that "the 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." Id.  Thus, the plaintiff had standing to bring a claim based on such injury. With respect to another plaintiff in that case who challenged a suburban community's "local preference" policy, defendants argued

15

he lacked standing because he was so far down the Section 8 waiting list that he was unlikely ever to receive a voucher.  The Second Circuit disagreed, holding that the "injury is not the failure to obtain housing assistance in the suburbs, but is the missed opportunity to compete for suburban housing on an equal footing with local residents."  Id. at 794.

Similarly, the alleged injury to Maggie Norflet is that Hancock failed or refused to provide complete information about the range of life insurance policies available, and steered her instead to purchase a "substandard" policy, because of her race.  Whether she could have afforded an "ordinary" policy is not material to her injury-in-fact, because the discrimination alleged is defendant's act of steering her and other African Americans to purchase more expensive, less-advantageous policies.  Plaintiff is not merely challenging the fact that Hancock sold her mother a "substandard" policy.  Rather, she is challenging Hancock's alleged establishment of incentives for its representatives to give incomplete information and steer African American customers in a way that limited their choices in comparison to the choices available to whites.

Unlike Warth, plaintiff's requested remedy does not depend on the actions of third parties.  If Hancock were ordered prospectively to offer life insurance policies on equal terms to African American and all other prospective customers, Maggie

16

Norflet's claimed injury would be redressed directly.  Further, such an order would redress plaintiff's complaint even if, afterwards, her mother were unable to afford premiums on any other type of life insurance policy.

For these reasons, it is not necessary that plaintiff allege that her mother would have been able to afford an "ordinary" life insurance policy had Hancock offered her one.  Plaintiff would have standing to pursue her complaint of racial "steering" based on the alleged injury-in-fact of "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit."  Northeastern Florida, 508 U.S. at 666.

Nonetheless, defendant argues that plaintiff will not be able to prove her allegations, and thus cannot establish standing, because the application forms for the life insurance policies at issue indicate that the applicant is "white." See Def. Mem. of Law Ex. A.  Defendant argues that this notation defeats plaintiff's claim that Hancock insurance representatives were given incentives to sell inferior policies predominantly to African Americans, as such a substandard policy was sold to the Norflets even though they were listed as white.  While this evidence obviously raises questions regarding the reason for this notation and the incentives, if any, facing Hancock representatives in selling insurance policies to customers of

different races, the mere fact that the two applications at issue list Maggie and Pearl Norflet as "white" is insufficient to defeat their standing to raise a claim of "steering," because it is undisputed that Maggie and Pearl Norflet are African American. Construing the allegations in plaintiff's favor at this point, the Court may presume that the Norflets' racial identity would have been known to the Hancock representative selling them the policies and collecting the weekly premiums in person.

At this point, it would be inappropriate to dismiss plaintiff's complaint without an explanation of the "white" notation, which could possibly support plaintiff's claim, e.g., that sales representatives were given incentives to sell substandard policies to African Americans including incentives to conceal their actions by designating the holders of substandard policies as white, when they knew otherwise.

"The party invoking federal jurisdiction bears the burden of establishing" the three required elements of injury, causation and redressability. Lujan, 504 U.S. at 561. However, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." Id. (internal quotation marks, alteration and citation omitted). At this stage of the case, plaintiff's allegations of injury and

18

causation -- namely, that Hancock steered the Norflets toward purchasing "substandard" life insurance policies because of their race -- are sufficient to subsume allegations of the specific facts necessary to prove standing -- that Hancock and its representatives knew the Norflets were African American and sold them or encouraged them to purchase "substandard" policies because of their race.  Therefore defendant's motion to dismiss the complaint for lack of standing must be denied.

### B.   Availability of Equitable Relief

Defendant also moves pursuant to Rule 12(b)(6) to dismiss Counts Three and Four of the complaint.  With respect to Count Three, defendant argues that plaintiff is not entitled to the declaratory and injunctive relief sought because plaintiff has an adequate remedy at law, particularly damages under §§ 1981 and 1982.  With respect to Count Four, defendant argues that plaintiff's unjust enrichment claim fails because the existence of a written contract precludes such quasi-contractual relief. The Court disagrees.

First, under 28 U.S.C. § 2201, a declaratory judgment may be issued "whether or not further relief is or could be sought." Thus, Rule 57 provides that the "existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate."  Fed. R. Civ. P. 57.  Plaintiff's demand for a declaration "that Hancock must engage in non-

discriminatory insurance practices," Am. Compl. ¶ 64, therefore is not precluded by the availability of a remedy at law.

"Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1362 (2d Cir. 1989).  However, "[a]n individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages" and such equitable remedies as backpay.  Johnson v. Ry. Exp. Agency, Inc., 421 U.S. 454, 460 (1975) (emphasis supplied).  Even if plaintiff were only entitled to either legal or equitable relief under the statute, plaintiff is permitted to plead in the alternative.  Fed. R. Civ. P. 8(e)(2) ("A party may ... state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds.").  Therefore it would be premature to dismiss plaintiff's claim for injunctive relief at this stage.

Finally, while "lack of a remedy under a contract is a precondition to recovery based on unjust enrichment or quantum meruit" in a breach of contract case, see United Coastal Indus, Inc. v. Clearheart Const. Co., 71 Conn. App. 506, 513, 802 A.2d 901, 906 (Conn. App. 2002), the Norflets do not allege breach of the Hancock life insurance contract.  They allege violation of

20

their federal statutory right to race-neutral treatment in contracting and property ownership.  Their claim for imposition of a constructive trust in Count Four merely specifies a portion of the equitable injunctive relief sought in Count Three as a remedy for the alleged racial discrimination.  Therefore defendant's motion to dismiss the claim for imposition of a constructive trust will be denied at this stage.

## IV.  MOTION FOR PROTECTIVE ORDER

Defendant's motion for a protective order to stay discovery until a ruling is issued on the motion to dismiss is now moot.  A supplemental scheduling order will be issued at a conference to be scheduled forthwith.

## V.  CONCLUSION

Accordingly, defendant's Motion to Dismiss [Doc. # 25] is DENIED and its Motion for a Protective Order [Doc. # 35] is DENIED AS MOOT.

IT IS SO ORDERED.

/s/
_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 27th day of March, 2006.**

21