| | | |
|---|---|---|
| MERLE NORFLET, AS FIDUCIARY OVER | : | |
| THE  PERSON AND ESTATE OF MAGGIE | : | |
| NORFLET, ON BEHALF OF HERSELF AND | : | |
| ALL OTHERS SIMILARLY SITUATED, | : | |
| PLAINTIFF, | : | Civ. No. 3:04cv1099 (JBA) |
| | : | |
| v. | : | |
| | : | |
| JOHN HANCOCK LIFE INSURANCE CO., | : | |
| DEFENDANT. | : | |

## RULING ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [DOC. # 81]

As fiduciary for her mother Maggie Norflet, plaintiff Merle

Norflet brought this suit alleging that defendant John Hancock

Life Insurance Company ("Hancock") discriminated against African

Americans in the sale of life insurance policies, in violation of

42 U.S.C. §§ 1981 and 1982.  Plaintiff now moves to certify the

following class pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3), and

(c)(4):

> All African American individuals who are purchasers,
> owners, insured or beneficiaries of industrial weekly
> life insurance policies or monthly debit policies
> issued by John Hancock prior to or during 1958.

(Pl. Supplem. Br. [Doc. # 124] at 1.)  For the reasons that

follow, plaintiff's motion will be GRANTED.

I.  Background

In this litigation, plaintiff Merle Norflet seeks a remedy for what she alleges to be defendant John Hancock Life Insurance Co.'s past violations of 42 U.S.C. §§ 1981 and 1982.  Ms. Norflet alleges that, during a period ending in 1958, Hancock maintained no-solicitation and no-commission policies with respect to sales of insurance policies to African Americans.  Ms. Norflet also urges that where Hancock deigned to sell policies to African Americans, it adhered to a discriminatory "steering" policy, under which African American customers were not offered the full range of Hancock's products, but were instead made to choose from lower-grade offerings known as "industrial," "industrial weekly," "burial," and "monthly debit" policies.  Amended Compl. at ¶ 2. The defendant denies both allegations.

Ms. Norflet, an African American woman residing in Waterbury, Connecticut, brings this action as conservator of the person and estate of her mother, Maggie Norflet, the purchaser of three Hancock weekly industrial policies.  The first policy, dated June 4, 1947, insures the life of Maggie Norflet in the amount of $472, with weekly premiums of $.40; the second insures the life of Pearl Norflet (Maggie's daughter, and Merle's sister) in the amount of $472, with weekly premiums of $.20.  (See Maggie

Norflet Policy No. 38443002, Angoff App. [Doc. # 107] Exs. 1-D, 1-E; Pearl Norflet Policy No. 38437743, Angoff App. [Doc. # 107] Exs. 1-D, 1-E.)  On the application forms for these policies, although Maggie and Pearl are African-American, they are identified as "white."  In 1958, Maggie Norflet applied to purchase another weekly industrial policy on her own behalf, listing Merle Norflet as the beneficiary.  On that "interview" form, Maggie Norflet's race is designated as "negro," and the sales agent's remarks note that Ms. Norflet's "[l]iving conditions and environment are better than the average negro class of living, no criticisms of living conditions."  (Maggie Norflet 1958 Appl., Pl. Cert. Hrg. Ex. 2.)

The plaintiff and her expert criticize industrial life insurance policies such as those sold to Maggie Norflet as being products which were marketed in a predatory fashion, which required total premium payments higher than the face value of the policy, and which tend to result in frequent lapses in coverage due to the manner in which premiums were collected.  (Angoff Report, Pl. Mot. Ex. A [Doc. # 82-3], at 1-3.)  Ms. Norflet contrasts industrial insurance with "ordinary," or term insurance, which has a relatively high face value and requires larger, less frequent periodic premiums.  Id.

Ms. Norflet alleges that her mother was subjected both to Hancock's discriminatory no-solicitation policy, and to its discriminatory steering policy. As to defendant's no-solicitation practice, Ms. Norflet points to policies 38443002 (insuring Maggie Norflet) and 38437743 (insuring Pearl Norflet), on which the defendant's agent had recorded both women's race as "white." Ms. Norflet alleges that this is prima facie evidence of the no-solicitation / no-commission policy, inasmuch as an agent wishing to be paid for selling policies to African Americans would simply mark the policies as having been sold to whites. Ms. Norflet has also tendered what she alleges to be internal Hancock memoranda showing that the company adhered to the no-commission policy during the period relevant to this litigation. See, e.g., Letter from Frank B. Maher, Second Vice Pres., John Hancock Mut. Life Ins. Co., to the Insurance Comm., John Hancock Mut. Life Ins. Co. (Nov. 5, 1952), Pl.'s Mot. for Class Cert. Ex. 1 [Doc. # 81-2] (noting that Hancock does not pay commission on sales to non-white insureds, but recommending payment of an aggrieved agent's commission because unfavorable New York regulatory action on the matter "could very well set a precedent which might occasion a considerable volume of this business coming from sources similar to the one under discussion.").

4

Hancock frankly admits that it "did not actively solicit African-Americans for the purchase of insurance products until the mid-1950s," and that it accordingly "generally did not pay commission to its agents on the sale of any of its policies . . . to African-Americans." Def.'s Opp. to Class. Cert. at 12, 13. Hancock couches its admission in an argument that the non-solicitation of African-Americans flowed "as a direct consequence of Hancock's decision to sell its insurance on a unitary rate basis," i.e. at identical premium rates for whites and African Americans "despite the actuarially demonstrably adverse mortality experience of African Americans," id. Moreover, Hancock argues that despite its no-solicitation / no-commission policy, Hancock would accept and process any life insurance applications received from African American customers just the same as "any other application," id. at 13. Irrespective of its motives, Hancock alleges that its no-solicitation / no-commission practice did not apply in New York, where the Legislature adopted a statutory ban on discriminatory insurance sales in 1935.[1] Id.

With respect to the discriminatory steering practice, Ms. Norflet contends that prior to 1958, defendant had a policy of not selling ordinary life insurance policies, "traditional whole

---

[1] In its current incarnation, the relevant provision is codified at N.Y. INS. LAW § 2606(b)(1) (Consol. 2007).

life policies with paid up additional riders," to African
Americans, instead selling them only inferior industrial life
policies.  Compl. [Doc. # 1] at ¶ 1.  Ms. Norflet alleges that
evidence of Hancock's steering can again be found in memoranda
and correspondence from the period, <u>see, e.g.,</u> Letter from G.W.
Cox, Chair, John Hancock Mut. Ins. Co, to Prof. Vishnu Oak,
Wilberforce Univ. (Jan. 30, 1947), Pl.'s Mot. for Class Cert.
Ex. 6 [Doc. # 81-2] (advising that Hancock's "Preferred Risk
policy was designed for a super class of mortality and economic
risks . . . and we think these conditions have not made it
applicable to Negro lives").

   According to plaintiff, the three Hancock industrial life
insurance policies owned by her mother Maggie were sold pursuant
to Hancock's steering policy.  Merle Norflet testified that her
mother purchased a "burial" policy "in case of death" and is
bringing suit "[b]ecause of the way the African-American was
treated in that time . . . [i]n connection with the insurance
policies John Hancock sold."  (Merle Norflet Dep., Pl. Mot. Ex. C
[Docs. ## 82-8 - 82-12], at 71, 73, 104.)  Ms. Norflet now seeks
class certification for her claims.

II.  <u>Standard</u>

   A plaintiff moving for class certification must prove that
the putative class action meets the four prerequisites

articulated in Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. "Additionally, a class action may be maintained only if it qualifies under at least one of the categories provided in Rule 23(b)." In re Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124, 132 (2d Cir. 2001). Plaintiffs preferably seek certification under Rule 23(b)(2) or (b)(3), with an initial certification as to liability only under Rule 23(c)(4)(A).

The Second Circuit has recently refined the standard for deciding a Rule 23 motion. While cautioning that class certification arguments should not "extend into a protracted mini-trial of substantial portions of the underlying litigation," the Second Circuit will now hold trial courts responsible for receiving "enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." In re Initial Public Offering Securities Litigation ("IPO"), 471 F.3d 24, 41 (2d Cir. 2006) (emphasis added). Of moment for this Court is IPO's apparent death knell for the "some showing" evidentiary threshold set forth in Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 292 (2d Cir. 1999) (holding, in a Title VII discrimination class action, that "class certification would not be warranted absent some showing that the challenged practice is causally related to a pattern of disparate

7

treatment"). Thus, in considering class certification, this
Court must steer a course between two disfavored shoals: mere
nose-counting of evidence, and "a partial trial of the merits."
IPO, 471 F.3d at 41.


III. Class certification under R. 23's commonality and typicality
     requirements

     Plaintiff moves to certify as a class "[a]ll African
American individuals who are purchasers, owners, insured or
beneficiaries of industrial weekly life insurance policies or
monthly debit policies issued by John Hancock prior to or during
1958." (Pl. Supplem. Br. [Doc. # 124] at 1.) At the heart of
the dispute over class certification are the parties' conflicting
conceptualizations of the nature of the alleged discrimination
claimed. While Ms. Norflet alleges a company-wide discriminatory
policy and urges that "[a]ll of the Class members were adversely
affected by John Hancock's common course of conduct to . . .
treat them differently by race" (Pl. Mem. [Doc. # 82] at 12),
defendant claims need for an individualized inquiry as to each
putative class member's ability to qualify for non-industrial
insurance and the conduct of individual Hancock agents with
respect to the class members.

The first and fourth prerequisites for class certification, numerosity and adequacy of representation, are not disputed by Hancock.[2]  As to the second and third, the commonality element is satisfied where plaintiffs' grievances share common questions of law or fact, FED. R. CIV. P. 23(a)(2).  The typicality requirement of 23(a)(3), on the other hand, "requires that the claims of the class representative[] be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (internal quotations omitted).

Hancock's primary arguments against certification are that Ms. Norflet has not shown that it maintained a racially

---

[2] Hancock's expert Randall Mire estimates "that there were about 550,000 Industrial policies issued to African-Americans from [sic] through 1967."  (Mire Report ¶ 150.)  Although 1967 is no longer the upper limit for the class period, a class fulfills the numerosity requirement if it is impracticable to join all the putative members, Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993), and we presume numerosity at 40, Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).
    As to the adequacy of representation, plaintiff's interests cannot be "antagonistic to the interest of other members of the class," and plaintiff's counsel must be "qualified, experienced and able to conduct the litigation," Baffa v. Donaldson, 222 F.3d 52, 60 (2d Cir. 2000).  No claim is made that plaintiff's interests conflict with those of the putative class members, and the Court is satisfied that plaintiff's counsel are well qualified to represent the putative class in this matter.

discriminatory policy, that certain defenses are unique to Maggie
Norflet's situation, and that individualized determinations of
liability must be made for each putative class member.

A. Common questions pertaining to the no-
   solicitation / no-commission policy

As to the non-solicitation policy, Hancock candidly admits
that it adhered to a practice of not marketing insurance to
African Americans during the period relevant to this suit.
Def.'s Opp. to Class. Cert. at 12, 13.  As the Supreme Court has
set forth, the lone remaining question is thus whether Hancock
acted with forbidden racial animus, which is an element of both
§§ 1981 and 1982 violations.  Gen. Bldg. Contractors Ass'n, Inc.
v. Penn., 458 U.S. 375, 391 (1982) (holding that § 1981 "can be
violated only by purposeful discrimination"); Rivera v. United
States, 928 F.2d 592, 608 (2d Cir. 1991) (citing Phillips v.
Hunter Trails Cmty. Ass'n, 685 F.2d 184, 187-89 (7th Cir. 1982))
(adopting the view that § 1982 claims "require proof of
intentional discrimination").

Any of the putative class members, proceeding alone or as a
group, would need to make out the discrimination prong of her or
his § 1981 and § 1982 claims with respect to Hancock's no-
solicitation / no-commission policy.  Under the plaintiff's
proposed class definition, the question of Hancock's

discriminatory intent towards any particular class member will have as its axillary inquiry the defendant's course of conduct in the sale of life insurance during the specified time period. As such, this Court is satisfied that the proposed class shares sufficient commonality on the question of Hancock's no-solicitation / no-commission practices.

As to typicality on the same claim, the inquiry is similarly straightforward. Since Hancock has confirmed that it pursued a common scheme of non-solicitation to all African Americans during the proposed class period – although, arguably without impermissible racial animus – Ms. Norflet's typicality seems a proposition of basic logic. This Court is satisfied that Ms. Norflet's claim of discrimination will be identical to class members', and that class members' claims share a common genesis in Hancock's long-ago decision not to market its life insurance products to African Americans.

B.  <u>Common questions pertaining to the alleged 'steering'</u>
    <u>practice</u>

Plaintiff advances the theory that defendant purposefully steered African Americans toward an inferior class of insurance policies by refusing to pay commissions on sales of ordinary life insurance to African Americans. Although the parties' experts

vigorously debate whether industrial policies are inherently inferior to ordinary policies (see, e.g., Angoff Report at 2-3; Mire Report ¶¶ 14-16; Angoff Rebuttal Report at 4-8), since they are undisputedly distinct from ordinary policies, any practice of "steering" could still be proven to be discriminatory under §§ 1981 and 1982 if Hancock intended to deprive African Americans of the opportunity to purchase ordinary policies.  See Runyon, 427 U.S. at 171.

Hancock's alleged steering of African Americans toward inferior policies by non-payment of commissions to its agents on ordinary life insurance products sold to Afriis claimed to be supported by an internal Hancock memorandum dated 1958, tracking the sales of "weekly premium" and "monthly debit ordinary" policies in the years 1954 through 1957 for "Colored Lives," "Puerto Ricans," and "Mexicans," observing that "there has been no alarming increase in the volume of applications submitted on this business."  Feb. 24, 1958 Mem., Pl. Reply Ex. H.  The parties dispute whether the "monthly debit ordinary" policies referenced in this memorandum are of the same inferior class as the industrial policies that form the basis of plaintiff's claims – i.e., "monthly debit" policies.  Plaintiff contends that monthly debit ordinary policies were distinct from industrial weekly only in terms of frequency of premium collection.

12

Defendant's 30(b) witness Barry Shemin urges that the "ordinary" in monthly debit ordinary self-evidently indicates a similarity to ordinary policies, or that the policies occupied a middle ground between industrial and ordinary policies, Shemin Dep. at 28-29. The specific features of Hancock monthly debit ordinary policies during the class period are properly characterized are factual, merit questions unnecessary for resolution in determining typicality and commonality.

Another memorandum dated 1958 explains defendant's reason for tracking the weekly premium and monthly debit ordinary policies. An associate actuary, one Grouty, wrote to Vice President and Actuary Harold A. Garabedian about defendant's 1953 "liberalization in compensation for debit business," which had sparked "concern regarding the effect . . . on the volume of applications submitted on Colored, Puerto Rican, and Mexican lives." (Memo to Garabedian, Pl. Mot. Ex. 9.)

Hancock's expert Mire interprets this "liberalization" as occurring "sometime around 1953," Mire Dep. at ¶ 82, thus making that year the endpoint of Hancock's discriminatory sales practices. However, neither Hancock nor Mire cite specific evidence concretely establishing 1953 as the date beyond which African American customers would not have been subject to the non-solicitation and steering policies. Even Hancock's chief

actuary, Barry Shemin, is able to pinpoint the date of cessation
no more precisely than sometime in the 1950's, stating instead
that Hancock has been "unable to determine exactly when or
whether it ended at the same time in every state," Shemin Dep. at
112:7-12. In the absence of evidentiary clarity on this date,
the Court will not affix the proposed class's end date at 1953.

Since the memoranda about annual sales of weekly and monthly
debit policies to African Americans, Puerto Ricans, and Mexicans
make no mention of ordinary policies, it could reasonably be
inferred that defendant was keeping records of the only types of
policies defendant sold to these demographic groups, reinforced
by a commission policy whereby agents were only paid commissions
for industrial life insurance. Evidence from prior years
demonstrates that Hancock considered African-American customers
as a separate and distinct demographic group to be addressed by
its policies and practices.[3] Hancock argues that the tracking of
debit sales merely reflects the nature of the few policies sold
to African Americans and other non-whites at that time, pointing

---

[3] In 1947, an associate actuary wrote to Vice President and
Actuary H.A. Grout about "writ[ing] colored business," suggesting
"grant[ing] from standard up to 150% rates for colored lives" and
with respect to industrial policies "add[ing] a sub-standard
class in which most colored lives would fall." (1947 Letter to
Grout, Pl. Mot. Ex. 5.)

to the absence of any comparative-commission-policy evidence. This dispute necessarily remains for merits disposition.

The question of whether African American customers could or would have purchased ordinary life insurance if not intentionally and systematically directed toward industrial life insurance lies at the center of Ms. Norflet's lawsuit, and plaintiff's evidence of Hancock's behavior towards African American customers satisfies the commonality prerequisite.[4]

In addition to contesting commonality, Hancock argues that plaintiff's claims are subject to a unique defense that precludes a finding of typicality: the 1947 Norflet policy applications classifying the women as white. As earlier discussed, plaintiff offers the explanation that Maggie and Pearl Norflet were identified as "white" on their June 4, 1947 applications in order

---

[4] Defendant urges the applicability of the class certification decision in In re: Am. Gen. Life Ins. Co. Indust. Life Ins. Litigation, No. 3:01-5000-CMC (D.S.C. Mar. 9, 2007) (unpublished) (Am. General Tr., Apr. 6, 2007 Def. Letter). In that case, a putative class of African American insureds brought suit alleging that defendant insurers' practices of maintaining "dual premium rates for its industrial life policies" was discriminatory. The district court denied class certification on the grounds, inter alia, that the commonality and typicality threshold requirements of Rule 23(a) had not been proven where "eight plan codes" over "numerous years and states covered" were implicated. The Court does not find the American General case particularly instructive given that the complexity of numerous plan codes and dual rating compels a different analysis of commonality and typicality than the comparatively straightforward question of steering within the two-policy (ordinary or industrial) structure that Hancock had in place.

for the agent to get a commission at a time no commissions were
given for sales to African Americans, made even more plausible by
the fact that Maggie Norflet is described as "negro" on her 1958
application, when commissions were being paid on "black
business," see Angoff Report at 7. From the circumstances of
record, the "white" identifier could inferably be proof of the
sweep of Hancock's racially-motivated sales policies, rather than
a peculiarity of Maggie Norflet's experience: since sales agents
were unlikely to mistake the elder Ms. Norflet for white on two
separate occasions, a much more likely explanation is that the
agent wishing to be paid for his work simply marked the policy as
having been sold to a white person.

Hancock further urges that plaintiff's lack of knowledge
about the facts and circumstances surrounding her mother's
interaction with the Hancock agent who sold her the policy
defeats typicality. However, since plaintiff's Sec. 1981 and
1982 claims base liability only on defendant's alleged company-
wide policies as generically applied to all African-American
policyholders, not the conduct of individual agents, this
certification motion is naturally different from that in Dobson
v. Hartford Life & Accident Insurance Co., No. 99cv2256, 2006
U.S. Dist. LEXIS 14922 (D. Conn. Mar. 31, 2006) (denying
certification based on lack of commonality and typicality because

"individualized assessment of the information available to the defendant-insurer within the regulation period, the complexity of the claim of disability, and other claims handling factors" were required in ERISA payments case).

B.    Ascertainability of class size

The final stop before considering whether the putative class may be certified under Rule 23(b)(2) and/or (b)(3) is Hancock's argument that the unascertainability of the putative class's size should preclude certification.

Rule 23 has been held to contain an implicit requirement "that the proposed class be precise, objective and presently ascertainable."  Harris v. Initial Sec., Inc., No. 05 Civ. 3873, 2007 U.S. Dist. LEXIS 18397, at *11 (S.D.N.Y. Mar. 7, 2007).  A class must be defined such that "the description of it is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member."  Mike v. Safeco Ins. Co. of Am., 223 F.R.D. 50, 52-53 (D. Conn. 2004) (citing 7A Charles A. Wright, et al., Federal Practice and Procedure § 1760, at 120-21 (2d ed. 1986)).

Focusing on the paucity of extant records, defendant's expert Mire points out that less than 3% of the 500,000-plus

policies purchased through 1967 (the original end-date of the proposed class) remain in effect, that "[f]ull electronic information is available on less than 10% of the class policies," and that "Hancock has only about 7% of the original paper applications for all the industrial life policies it has issued." (Mire Report ¶¶ 150, 150(h)(i).)  Given the dated nature of the policies at issue, the Court acknowledges that it may be difficult to notify putative class members and that many of the purchasers, owners, insureds or beneficiaries may already be deceased.  Even if all the putative class members cannot be reached, Hancock's expert estimates that electronic and paper files exist for approximately 89,000 putative class members – not an insignificant number.  Mire Report at ¶ 150.

Moreover, defendant's ascertainability argument is not squarely on point, as the cases supporting the ascertainability requirement concern themselves more with the specificity of the class definition than the logistics of locating and notifying class members.  Compare Harris, 2007 U.S. Dist. LEXIS 1839 (deeming a class consisting of "'dark-skinned' employees" unascertainable for lack of sufficiently-objective criteria); Mike, 223 F.R.D. 50 (denying certification for unascertainability where proposed class was to consist of employees "whose primary

duties were to appraise damage[]"); with Cortigiano v. Oceanview

Manor Home for Adults, 227 F.R.D. 194 (E.D.N.Y. 2005) (finding

class of disabled persons living at a long-term care facility

ascertainable where their identities could "be determined with

documents that are under the custody and control of defendants").

The class here does not suffer from such definition defects.  To

the extent defendant is concerned about overlapping class members

– i.e., that two or more people could claim a single policy –

this point is overblown, as ultimately only one individual

(usually the beneficiary) can recover on a single policy.  Thus,

the Court finds that the plaintiff's proposed class satisfies the

ascertainability requirement.


III. Certification Under Rule 23(b)(2) and (b)(3)

     Once Fed. R. Civ. P. 23(a)'s numerosity, commonality,

typicality, and representativeness requirements are satisfied,

the prospective plaintiff must persuade a court that her action

is one of the types listed as permissible under R. 23(b).  Rule

23(b)(2) permits class actions for non-monetary relief, where

"the party opposing the class has acted or refused to act on

grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory

relief with respect to the class as a whole."  Ms. Norflet has

sought certification of her action under this provision.

In her amended complaint, Ms. Norflet asks this Court to enjoin Hancock "from collecting premiums on any policy where the premiums are paid in connection with a policy that is discriminatory in nature," to mandate that Hancock "adjust policy values to correct for its racial discrimination," and to enjoin Hancock engaging in "any and all forms of ongoing racial discrimination in the administration of policies sold to African-Americans." (Am. Compl. ¶ 65.)[5]  Hancock argues that Rule 23(b)(2) certification is improper because Ms. Norflet's demands for declaratory or injunctive relief are merely thinly-disguised demands for money damages.

The Second Circuit has instructed that a district court may grant 23(b)(2) certification where:

> it finds in its informed, sound judicial discretion that (1) the positive weight or value of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy.

Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 164 (2d Cir. 2001).  The Court exercises caution in granting 23(b)(2)

---

[5] Defendant has represented that "all remaining industrial life policies became fully paid up in 1985," such that no further premiums need be paid.  Def. Opp. Mem. at 43.)

certification because, unlike 23(b)(3) predominance actions, 23(b)(2) actions do not require that class members be given notice and the chance to opt out. Therefore, 23(b)(2) is "inappropriate if monetary damages is the predomina[nt] relief that is sought in an action." Matyasovszky v. Hous. Auth. of Bridgeport, 226 F.R.D. 35, 44 (D. Conn. 2005).

Here, to be sure, money damages are a component of plaintiff's requested relief, but at the heart of plaintiff's claim is a demand for acknowledgment and remediation of a systemic discriminatory practice. In Robinson, the Second Circuit cautioned district courts not to employ an overly-narrow interpretation of incidental money damages for (b)(2) purposes, so as not to "foreclose[] (b)(2) class certification of all claims that include compensatory damages (or punitive damages) even if the class-wide injunctive relief is the form of relief in which the plaintiffs are primarily interested," 267 F.3d at 163 (internal quotations omitted). Although defendant argues that Robinson is inapplicable to this case because plaintiff's Sec. 1981 claim requires individualized liability determinations that were not required in the practice/policy and disparate impact Title VII claims of the African-American employee class in Robinson (Def. Post-Hrg. Br. at 10), plaintiff Norflet bases her civil rights claim on an alleged explicit company-wide

discriminatory policy, and not upon the actions of individual agents.  In short, the class's success stands or falls on proof of the existence of the discriminatory policy (and its attendant intent), and the Court therefore finds it appropriate to certify the class under Rule 23(b)(2).

### A. Certification Under Rule 23(b)(3)

The second permissible type of suit which may be class certified is R. 23(b)(3)'s predominance action.  Ms. Norflet also seeks certification of her action under this provision.

Under R. 23(b)(3), a court may certify the class where it finds that:

> the questions of law or fact common to the
> members of the class predominate over any
> questions affecting only individual members,
> and that a class action is superior to other
> available methods for the fair and efficient
> adjudication of the controversy.

Hancock opposes 23(b)(3) certification, arguing that each class member may have been told different things by the selling agents, that not all class members could have afforded ordinary insurance, and that the applicability of the statute of limitations requires individualized determinations.

### a.  Predominance

The predominance requirement is a more demanding version of R. 23(a)'s commonality requirement, and "tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation." <u>Heerwagen v. Clear Channel Communs.</u>, 435 F.3d 219, 226 (2d Cir. 2006) (internal quotation omitted). Generally, the liability issue controls the court's predominance calculus: "if the liability issue is common to the class, common questions are held to predominate over individual questions." <u>In re Sumitomo Copper Litig.</u>, 182 F.R.D. 85, 91 (S.D.N.Y. 1998) (internal quotations omitted).

Defendant relies on <u>Moore v. PaineWebber, Inc.</u>, 306 F.3d 1247, 1255 (2d Cir. 2002), to argue that questions common to the class have not been shown to predominate over individual questions. <u>Moore</u> is readily distinguishable, however: there, the plaintiffs were proceeding on a theory of fraud which alleged that the defendant corporation's individual sales agents intentionally misrepresented material facts about an investment vehicle during one-on-one sales calls with prospective investors. Here, Ms. Norflet is not alleging oral misrepresentation; she bases her suit on a company-wide policy enforced through its

commission system, and not on any claim of wrongdoing by

Hancock's agents themselves.[6]

For its part, Hancock contends that the need for

individualized damages determinations precludes (b)(3)

certification.  Hancock argues that even if Ms. Norflet succeeds

in establishing the presence of a company-wide discriminatory

sales policy, "[t]here are numerous factual scenarios" under

which its transactions with African American customers may have

occurred free from taint, such as when a prospective purchaser

simply could not afford the premiums on an ordinary life

insurance policy, Def.'s Opp. to Cert. at 52.  Moreover,

Hancock's expert Mire asserts in his report that Hancock "could

and did pay a death benefit under an Industrial life insurance

policy to parties who incurred the expense of the insured's

funeral or final illness," thus affecting a damage calculation.

Mire Report at ¶ 143.  As authority for its position, Hancock

cites Jackson v. Motel 6 Multipurpose, 130 F.3d 999 (11th Cir.

1997), decertifying a Rule 23(b)(3) class which was prosecuting

alleged Secs. 1981 and 2000a (Civil Rights Act of 1964)

violations against a national motel chain.  The district court's

---

[6] Nor is this a case where the class members' claims are based on
"varied contractual agreements" demanding "individual factual
inquiries" which would "negate[]" the efficiency of a class
action suit, Auscape Int'l v. Nat'l Geogr. Soc., No. 02 Civ. 6641
LAK HBP, 2003 WL 23531750, at *14 (S.D.N.Y. July 25, 2003)

error in that litigation, the Eleventh Circuit held, was in

certifying the class despite the individual, fact-intensive

examinations which the damages phase would entail, including:

> whether there were any rooms vacant when that
> plaintiff inquired; whether the plaintiff had
> reservations; whether unclean rooms were
> rented to the plaintiff for reasons having
> nothing to do with the plaintiff's race;
> whether the plaintiff, at the time that he
> requested a room, exhibited any non-racial
> characteristics legitimately counseling
> against renting him a room; and so on.

Motel 6, 130 F.3d at 1006.  Although this Court acknowledges that

here predominance poses a potentially close question with respect

to damages, the centrality of the company-wide policy to the

liability question suggests that the plaintiff's claims may be

readily tested through "generalized proof . . . applicable to the

class as a whole," and the action is therefore ripe for R.

23(b)(3) certification.   Visa Check 280 F.3d at 136.

     This Court is well aware of the Second Circuit's direction

that trial courts hearing class actions "reassess their class

rulings as the case develops," Boucher v. Syracuse Univ., 164

F.3d 113, 118 (2d Cir. 1999) (internal quotation omitted).

Should individual questions begin to eclipse the common questions

at the core of this case, especially, as Hancock anticipates,

during the damages phase, Rule 23 and its attendant decisional

law provide this Court with a range of case management options to

ensure an equitable and efficient resolution to the matter,

including class decertification, bifurcation of liability and

damage phases under Rule 23(c)(4), or even "appointing a

magistrate judge or special master to preside over individual

damages proceedings; . . . [and] creating subclasses."  Visa

Check, 280 F.3d at 141.


### b.  Superiority and efficiency of the class action form

The remaining elements for Rule 23(b)(3)

certification are the superiority and efficiency of the class

action mechanism as a method of adjudication.  Four factors are

relevant here: the interest of the members of the class in

bringing separate actions, the extent and nature of existing

litigation concerning the controversy, the desirability of

concentrating the litigation in the forum, and the difficulties

likely to be encountered in managing a class action.  Fed. R. Civ.

P. 23(b)(3).  In addition, a class action is considered a

superior mode of adjudication where "it would increase the

public's awareness of the suit and thereby increase[] the number

of individuals able to vindicate their rights."  In re State

Police Litigation, No. 89CV606, 1998 WL 91064, at *5 (D. Conn.

Jan. 27, 1998) (denying in part defendants' motion for

decertification and further noting that "in addition to saving

the enormous amount of judicial resources that would be expended on these individual suits, class certification also promotes a uniformity of decisions with respect to all of the individual class members.")(internal quotations omitted).

As to individual class members' interest in pursuing separate actions, given that most purchasers of the industrial policies at issue may have been of limited financial means, it stands to reason that it is extremely unlikely that any individual plaintiff could afford to pursue this type of suit on his or her own.  In terms of simultaneous litigation, the Court is aware of no similar pending action against Hancock.  The factor of venue does not weigh against litigating the case in this district, even though many of the original policy purchasers were located elsewhere, primarily in neighboring New York.

Lastly, the Court does not consider the potential statute of limitations problems to be disruptive enough to counsel against the class action form.  Where the discriminatory policies complained of in this suit reach back approximately fifty years, every applicable state statute of limitations is likely to have run.  Since accrual of Sec. 1981 and 1982 claims occurs when a person "knew or should have known of the discrimination," Holt v. KMI-Continental, 95 F.3d 123, 131 (2nd Cir. 1996), it will be plaintiffs' burden to prove that class

members commenced their action in a timely manner.  See also Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 163 (2d Cir. 1989) ("[t]he general rule in this circuit is that a cause of action accrues when the plaintiff could first have successfully maintained a suit based on that cause of action.") (internal quotations omitted).  Unsurprisingly, Ms. Norflet proposes to cure the lapse problem by asserting a fraudulent concealment theory, i.e. that John Hancock actively prevented class members from knowing of its discriminatory acts and purposes.  In support of this contention, plaintiff cites, inter alia, Hancock's May 18, 2000 letter to Wall Street Journal reporter Scot Paltrow, in which Hancock did not disclose the company's non-commission policy on "black business," affirmatively stated that the company "did not charge African-Americans higher premiums or provide them with different benefits because of their race," and asserted that its "records do not indicate why African Americans were not 'desired as risks.'"  Angoff Report at 10.  Plaintiff also points to defendant's representations to the New York Insurance Department and the Minnesota Commerce Department's race-based underwriting surveys that it had ceased its racially discriminatory sales practices in 1928.  To rebut this, defendant submits the report of Prof. Henry M. McKiven, Ph.D., who posits that many putative class members will have learned of alleged

28

racial discrimination in the insurance industry by word of mouth

or by publication notice, especially in northeastern cities in

which black newspapers were published.  McKiven Report, Def. Ex.

A at 17 [Docs. ## 103-3, 95-2].  Given that both parties rely on

media sources and other large-scale sources of information, the

question will not be when each individual class member became

aware of his or her cause of action under § 1981; rather, the

fact-finder will have to determine when a person fitting the

class description should have known that she had a claim under

§§ 1981 and 1982.[7]  The mere prospect of the fact-finder having

to eventually consider fraudulent concealment questions hardly

dooms class certification out of concern for manageability.  <u>See</u>

<u>Plaintiffs Class v. Credit Lyonnais Rouse, Ltd.</u>, 262 F.3d 134,

137, 143 (2d Cir. 2001) (declining interlocutory appeal of class

---

[7] Defendant's reliance on <u>Broussard v. Meineke Discount Muffler</u>
<u>Shops, Inc.</u>, 155 F.3d 331, 342 (4th Cir. 1998), with respect to
their statute of limitations argument is misplaced.  In
<u>Broussard</u>, the court reversed the district court's certification
of a putative class of franchisees alleging fraud in part because
"tolling the statute of limitations on each of plaintiffs' claims
depends on individualized showings that are non-typical and
unique to each franchisee," but at issue in that case were
"misrepresentations and obfuscations" made by franchisor
representatives, not company-wide policies.  <u>Id.</u>  The class
treatment of fraud claims, moreover, is guided by the principle
that "a fraud case may be unsuited for treatment as a class
action if there was material variation in the representations
made or in the kinds or degrees of reliance by the persons to
whom they were addressed."  Fed. R. Civ. P. 23(b)(3) advisory
committee's note (1966 amendment).

certification where district court permitted addition of
fraudulent concealment allegations, and noting that where the
district court determines that "fraudulent concealment [i]s a
factual issue to be determined at trial . . . [w]e ordinarily
defer to such rulings."). See also In re Monumental Life Ins.
Co., 365 F.3d 408, 421 (5th Cir. 2004) (noting that the presence
of time-barred class members "does not establish that individual
issues predominate, particularly in the face of defendant's
common scheme of fraudulent concealment."); Thompson v. Metro.
Life Ins. Co., 149 F. Supp. 2d 38, 54 (S.D.N.Y. 2001) (denying
summary judgment for defendant in §§ 1981 and 1982 class action
where equitable tolling and evidence of continuing violations
presented issues of fact as to whether the statute of limitations
barred plaintiff's claims). Thus, having found predominance,
superiority, and efficiency satisfied, the Court concludes that
certification of the class is proper under FED. R. CIV. P.
23(b)(3).


IV.   Conclusion

     Accordingly, plaintiff's Motion for Class Certification with
respect to "[a]ll African American persons who are purchasers,
owners, insureds or beneficiaries of industrial weekly life
insurance policies or monthly debit policies issued by John

Hancock prior to or during 1958," is GRANTED under Fed. R. Civ. P. 23(b)(2) and (b)(3).

IT IS SO ORDERED.

/s/

_____

JANET BOND ARTERTON, U.S.D.J.

Dated at New Haven, Connecticut, this 6th day of September, 2007.