UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MERLE NORFLET, AS FIDUCIARY OVER | : | |
| THE  PERSON AND ESTATE OF MAGGIE | : | |
| NORFLET, ON BEHALF OF HERSELF AND | : | |
| ALL OTHERS SIMILARLY SITUATED, | : | |
| PLAINTIFF, | : | Civ. No. 3:04cv1099 (JBA) |
| | : | |
| v. | : | |
| | : | |
| JOHN HANCOCK FINANCIAL SERVICES, | : | |
| DEFENDANT. | : | |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 128]

In this case, Merle Norflet, as fiduciary for her mother
Maggie Norflet, brought suit alleging that defendant John Hancock
Life Insurance Company ("Hancock") discriminated against African
Americans in the sale of Hancock life insurance policies through
1958, in violation of 42 U.S.C. §§ 1981 and 1982.  Hancock now
moves for summary judgment, which motion will be DENIED.

I.    Background

Plaintiff Merle Norflet, daughter and fiduciary of Maggie
Norflet, alleges that Hancock violated her mother's civil rights
by refusing to sell African Americans life insurance policies,
and by steering them toward industrial (as against "ordinary"
term) life insurance policies.  The Amended Complaint refers to
two Hancock weekly premium industrial policies: one dated June 4,
1947, which insures the life of Maggie Norflet in the amount of

1

$472, with weekly premiums of $.40; the other, also dated June 4, 1947, which insures the life of Pearl Norflet (daughter of Maggie and sister of Merle) in the amount of $472, with weekly premiums of $.20.  (See Maggie Norflet Policy No. 38443002, Def. Ex. 17; Pearl Norflet Policy No. 38437743, Def. Ex. 18.)  Maggie and Pearl, both African-American, are identified as "white" on the 1947 application forms.  In 1958, Maggie Norflet applied for a weekly industrial policy on her own behalf, with respect to which the Hancock agent listed her race as "negro."  (Maggie Norflet Policy No. 43869929, Def. Ex. 21.)

According to Hancock, at the time Maggie Norflet purchased her 1947 policies, industrial life insurance typically offered death benefits of less than $500, with premiums collected weekly or monthly at the policyholder's home; whereas ordinary policies offered death benefits of $1000 minimum and with premiums payable no more frequently than four times per year.  (Mire Rep., Def. Ex. 1, ¶¶ 69, 72.)  Hancock discontinued selling industrial life insurance policies in 1967, and in 1985, Hancock "paid up" all in-force industrial life policies, waiving future premiums. (Dec. 20, 1967 Ltr., Def. Ex. 15; Mire Rep., Def. Ex. 1, ¶ 81(d).)

Except in New York State, which statutorily forbade differential commission practices for sales of insurance to African Americans beginning in 1935, Hancock maintained no-solicitation and no-commission policies with respect to sales of insurance policies to African Americans until sometime in the the mid-1950s.  (Mire Rep., Def. Ex. 1, ¶ 82(b), (d), (f).)

Hancock now moves for summary judgment, arguing that the evidence tendered by Ms. Norflet is insufficient to support her allegations.  Ms. Norflet counters, and additionally opposes on the basis of FED. R. CIV. P. 56(f).

II.  Standard

Summary judgment is appropriate where pleadings, taken together with the evidence, show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The party seeking summary judgment bears the burden of showing "that the undisputed facts establish [its] right to judgment as a matter of law."  Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002).  The duty of the court is to determine whether there are issues to be tried; in making that determination, the court must draw all

3

inferences in favor of the party opposing summary judgment, viewing the factual disputes in the light most favorable to that party.  Phaneuf v. Fraikin, 448 F.3d 591, 595 (2d Cir. 2006). Thus, if "reasonable minds could differ" as to the weight of the evidence, or the evidence in the record suggests reasonable inferences in favor of the non-moving party, "the moving party simply cannot obtain a summary judgment."  R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).

Nevertheless, defendants moving for summary judgment "need not prove a negative" on an issue on which plaintiffs would bear the burden of proof at trial.  Rather, a defendant need only point to an absence of proof on plaintiff's part – an absence which the plaintiff may rebut by "'designat[ing] specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex v. Catrett, 477 U.S. at 324 (1986)).  To avoid summary judgment, however, a non-moving party must do more than sow "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); it must come forward with evidence that would be sufficient to support a jury verdict in his or her favor, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

4

III. <u>Discussion</u>

Relying on the burden-shifting framework from the Supreme Court's Title VII employment discrimination decision in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973), Hancock argues that Ms. Norflet cannot prove the intent and actual damages elements of her § 1981 claim.  For her part, Ms. Norflet contests the applicability of <u>McDonnell Douglas</u> on the basis that she has introduced direct evidence of discrimination.

A.    <u>Standards for §§ 1981, 1982 Claims</u>

Under 42 U.S.C. § 1981(a), all United States citizens "shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."[1]  To prevail on a § 1981 claim, a plaintiff must prove that (1) she is a member of a racial minority; (2) the defendant intentionally discriminated against her on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute.  <u>Mian v. Donaldson, Lufkin & Jenrette Secs.</u>

---

[1] "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).  Section 1982,
meanwhile, provides that "[a]ll citizens of the United States
shall have the same right, in every State and Territory, as is
enjoyed by white citizens thereof to inherit, purchase, lease,
sell, hold, and convey real and personal property."  42 U.S.C.
§ 1982.

Under both §§ 1981 and 1982, a plaintiff must prove that a
defendant's discriminatory actions were intentional.  Gen. Bldg.
Contractors Ass'n, Inc. v. Penn., 458 U.S. 375, 391 (1982)
(holding that § 1981 "can be violated only by purposeful
discrimination"), Rivera v. United States, 928 F.2d 592, 608 (2d
Cir. 1991) (citing Phillips v. Hunter Trails Cmty. Ass'n, 685
F.2d 184, 187-89 (7th Cir. 1982)) (adopting the view that § 1982
claims "require proof of intentional discrimination").

As to the plaintiff's burdens, McDonnell Douglas applies to
§ 1981 claims, Patterson v. McLean Credit Union, 491 U.S. 164,
186-187 (1989).  See also Iuorno v. DuPont Pharms. Co., 129 Fed.
Appx. 637, 639 (2d Cir. 2005) (summary order) (collecting cases
on McDonnell Douglas applicability to discrimination statutes);
Weiss v. La Suisse, Societe d'Assurances Sur La Vie, 260 F. Supp.
2d 644, 650 (S.D.N.Y. 2003) (applying McDonnell Douglas analysis
in § 1981 disparate impact case of alleged non-payment of
insurance policies to Jewish policyholders).  Although the Second

Circuit has not spoken to the question of whether the <u>McDonnell Douglas</u> framework would apply to § 1982 claims as well, it is unnecessary to decide that issue. The record in this case includes direct evidence of race discrimination by the defendant, and a plaintiff "need not show circumstances giving rise to an inference of discrimination when the plaintiff presents direct evidence of discrimination." <u>Sanders v. N.Y. City Human Res. Admin.</u>, 361 F.3d 749, 757 (2d Cir. 2004). Thus, an analysis of plaintiff's evidence on the elements required by her §§ 1981 and 1982 claims will be utilized.

B. <u>Intentional Race Discrimination</u>

It is undisputed that Ms. Norflet is a member of a racial minority and that the discrimination alleged was impairment of her right to equally enjoy the terms of a contractual relationship with Hancock under § 1981, and right to property (in the form of life insurance benefits) under § 1982. The only disputed issue is whether Hancock intentionally discriminated against plaintiff with respect to these rights on the basis of her race.

1. <u>Plaintiff's theory of the case</u>

Before examining the evidence of intent in the record, it is useful to address several arguments made by Hancock.  First, Hancock emphasizes plaintiff's lack of knowledge of the circumstances of her mother's purchase of the policies – including whether Maggie Norflet could have even afforded ordinary life insurance, which Hancock contends is relevant to establishing discriminatory intent.  There is no dispute that plaintiff knows little about the circumstances in which her mother purchased the policies at issue: Merle Norflet testified that she has no information about why her mother applied for weekly premium insurance, whether her mother possessed information about other types of available Hancock policies, whether her mother could afford ordinary insurance, or what the agent told her mother when making the sales.  (Norflet Dep., Def. Summ. J. Mot. Ex. 7, at 87-89.)  However, Ms. Norflet argues that because systemic discrimination is at issue, the conduct of the individual agent or her mother's particular circumstances are not relevant.  Because the record contains evidence supporting an inference of company-wide discrimination against African Americans, the fact that Merle Norflet possesses no knowledge of her mother's individualized circumstances at the time when the policies were purchased, or of the interaction between her mother

and the Hancock agent, is not fatal to plaintiff's §§ 1981 and 1982 claims.[2]

Secondly, Hancock accuses plaintiff of "cobbl[ing] together a new theory which attempts to reconcile the obvious inconsistency between a 'no solicitation policy' and a 'steering' scheme." (Def. Reply at 5.) Hancock contends that Ms. Norflet's opposition memorandum sets out a theory alleging both refusal-to-sell and no-commission practices with respect to African Americans, whereas the Amended Complaint focused on a company-wide practice of steering African Americans toward inferior industrial policies. (Id. at 3-5.) While this Court has previously observed that a summary judgment memorandum "is not the proper place to present new claims which, in effect, amend the complaint," Kennedy v. BMW Fin. Servs., N.A., 363 F. Supp. 2d

---

[2] Defendant cites Semanko v. Minnesota Mutual Life Insurance Co., 168 F. Supp. 2d 997, 1000-01 (D. Minn. 2000), for the proposition that summary judgment must be granted in the insurance fraud-type context where a plaintiff lacks useful recollection of fundamental facts underlying her claims. That case is distinguishable, however, as the court's finding that plaintiff "failed to provide the kind of specific evidence necessary to support his allegation under Rule 56" was made with respect to plaintiff's failure to recall details of the sales presentation made by an insurance agent in the context of negligent misrepresentation and fraud claims brought against the insurance company.

110, 114 n.8 (D. Conn. 2005), Ms. Norflet is not now advancing an entirely new claim which departs from the legal theory in her complaint.  Ms. Norflet's Amended Complaint alleges that "Hancock either refused to service African Americans altogether or maintained a deliberate company-wide practice of steering African Americans to its inferior and more expensive Substandard policies" (Am. Compl. ¶ 12); her opposition memorandum states that "Hancock discriminated against African Americans by instructing its agents not to solicit their business, and by refusing to pay a commission on sales to African Americans" (Pl. Opp. at 14), and "that only by falsifying Mrs. Norflet's race, and selling her an industrial rather than an ordinary policy, could the agent hope to be paid a commission" (id. at 11).  Thus, Ms. Norflet's opposition memorandum properly marshals evidence of practices of both no-commission/no-solicitation and steering (a variant of the no-commission policy) to ground §§ 1981 and 1982 liability.

> 2.  Discrimination based on no-commission/no-
>     solicitation practices

There is no dispute that for some period in the past, Hancock had a practice of not soliciting black customers or paying commissions on sales to African Americans.  Based on Hancock documents from that period, defendant acknowledges that

up to a point in the 1950's, no commission was paid on any sales
of Hancock policies to African Americans, except in New York,
which statutorily mandated such payments.  For instance, a March
13, 1953 letter from a Hancock lawyer to a New Jersey government
official states that "[t]he Company does not pay commissions on a
policy insuring such a risk (colored persons of African descent),
unless, as in the case of New York, there is a statute requiring
such payment."  (Mar. 13, 1953 Ltr. from Gilman to Bittel, Def.
Ex. 11.)  An internal memorandum dated November 5, 1952 states:
"we do not pay commission on such business (policies issued on
non-caucasian lives) issued outside of the state of New York."
(Nov. 5, 1952 Ltr. from Maher to Ins. Comm., Def. Ex. 13.)

Hancock nonetheless attacks this evidence as insufficient,
arguing that because Maggie Norflet succeeded in purchasing
insurance despite Hancock's company-wide no-commission policy,
she could not have been injured by it.  Hancock points out that
plaintiff's expert Jay Angoff testified that the sales practice
as of 1953, i.e., Hancock's no-commission policy, had the "effect
of . . . prevent[ing] blacks from obtaining insurance from
Hancock" (Angoff Dep., Def. Ex. 4, at 220), which is not the case
with respect to Ms. Norflet.  However, plaintiff has proffered
evidence that Maggie Norflet's purchases were made by subverting
this no-commission policy.  In 1947, when the no-commission

policy was undisputedly in effect, Maggie and Pearl Norflet were identified as "white" on their application forms. In 1958, when commissions were being paid on <u>all</u> business, Maggie Norflet's race was listed as "negro" on her application for industrial insurance. Thus, the only way Ms. Norflet could have contracted with Hancock on an equal footing with white customers during the existence of the no-commission policy was by an agent falsely passing her off as white on the paperwork. Because she could not obtain an insurance contract as an African American, only as a faux white person, her injury fits within the rights protected by §§ 1981 and 1982, and summary judgment for the defendant must therefore be denied on the non-solicitation claim.

### 3. Discrimination based on steering

The second prong of Ms. Norflet's §§ 1981 and 1982 claims is that her mother was deprived by Hancock of the opportunity to be offered ordinary insurance, as white consumers were, on account of her race. Norflet contends that Hancock's steering policy, like its non-solicitation policy, was enforced by its refusal to pay commissions on ordinary policies sold to African Americans. In moving for summary judgment, Hancock argues that Ms. Norflet's theory is speculative and unsupported by concrete evidence of an institutional steering scheme.

Nonetheless, there is documentary evidence from Hancock indicating a practice of steering African Americans toward industrial, and away from ordinary, insurance policies.  First, a Hancock memorandum dated 1947 states that while

> it has been the Company's practice to treat
> colored applicants for Ordinary insurance in
> the same way as white applicants . . .
> [t]here seems to have been an informal
> practice of not paying commissions on this
> business although my understanding is that
> there has never been a provision in the
> Agent's contract on this point.

Letter from unnamed Hancock Second Vice Pres., to Charles J. Diman, Chairman, John Hancock Insurance (Jan. 15, 1947), Def.'s Opp. to Class Cert. Ex. L.  Second, there is evidence of a change that occurred with respect to Hancock commissions policies sometime in the 1950's, after which sales agents were paid commissions on the sale of certain policies to non-whites.  One Hancock memorandum from 1958 references a "liberalization in compensation for debit business" (Memo to Garabedian, Pl. Class Cert. Mot. Ex. 9),[3] while another from that year compares sales of weekly and monthly industrial policies sold on "Colored Lives," "Puerto Ricans," and "Mexicans" in the years 1954 through 1957, finding "no alarming increase in the volume of applications

---

[3] Plaintiff's opposition memorandum to defendant's Motion for Summary Judgment incorporates the exhibits appended to plaintiff's Motion for Class Certification.

submitted on this business" (Feb. 24, 1958 Mem., Pl. Class Cert.
Reply Ex. H).  While the former document suggests a relaxation of
the commissions policy in 1953, the latter document, which tracks
only the numbers of debit policies sold to non-white demographic
groups, constitutes evidence that the payment of commissions on
policies sold to African Americans after 1953 was nonetheless
restricted to sales of industrial weekly and monthly policies.[4]
Moreover, defendant's records disclose a chart listing by
district the "weekly premium business issued on colored lives,
1950" (1950 WPI Chart, Def. Ex. 12), but no such chart exists for
other types of insurance.

The foregoing evidence raises a triable issue of fact as to
whether defendant engaged in steering practices violative of
§§ 1981 and 1982.  Hancock points to the opinion of its expert
witness Randall P. Mire that industrial insurance was developed
for socioeconomic reasons and that 99% of the people buying
industrial insurance up to 1953 were white (Mire Rep., Def. Ex.

---

[4] While not necessarily indicative of commissions-based
steering, Hancock's 1935 "Rate and Instruction Book" suggests
that ordinary insurance was off-limits for non-whites.  The book
instructs with respect to ordinary insurance: "Restricted
Nationalities.--Persons of African descent, Cape Verde Islanders
and Chinese are not desire as risks, and Agents must not solicit
such persons.  If, however, they voluntarily apply for insurance,
an application must be regularly filled out, with the statement
of the Agent that the business was not solicited."  (1935 Instr.
Bk., Def. Ex. 26.)

1, ¶¶ 66(b)(ii), 69, 72).  Because this case involves neither a disparate impact claim nor only indirect evidence of discrimination, it is of no moment that white persons constituted the vast majority of those insured by industrial policies – in no small part because they constitute the vast majority of the consumer public.

Hancock cites <u>Brown v. American Honda Motor Co., Inc.</u>, 939 F.2d 946, 952 (11th Cir. 1991), and <u>McCoy v. Homestead Studio Suites Hotels</u>, 390 F. Supp. 2d 577, 583-84 (S.D. Tex. 2005), for the proposition that no § 1981 violation can occur where a practice affects all races in the same way.  While evidence of intentional race discrimination would clearly be lacking where adverse practices were employed regardless of race, <u>Brown</u> and <u>McCoy</u> are inapposite where there is evidence of systemic, race-based policymaking.  In <u>Brown</u>, the Eleventh Circuit held that no § 1981 violation occurred where all inexperienced applicants, white and black, were denied a car dealership franchise in favor of a white applicant who already ran a dealership in the state.  In <u>McCoy</u>, the trial court found no §§ 1981 and 1982 violations to have occurred where Falun Gong practitioners of Chinese descent were denied hotel rooms in favor of individuals of the same racial background.

Lastly, it is undisputed that Maggie Norflet worked as a "checker" at a laundry and was likely of limited financial means when she purchased the 1947 policies (see Norflet Dep., Def. Ex. 7, at 45-47). As well, it was indicated on the application form for the elder Ms. Norflet that she "preferred weekly" installment insurance, Maggie Norflet Policy No. 38443002, Def. Ex. 17. However, Maggie Norflet's lower-income status does not necessarily defeat the steering claims: if Ms. Norflet's mother was never afforded the chance to buy ordinary insurance on account of Hancock's steering practice, then she was deprived of the opportunity to choose how to use her limited means and to enjoy the right to contract under those statutes.[5] Hancock's

---

[5] Plaintiff contests the evidentiary value of the agent's representation on Maggie Norflet's 1947 application that plaintiff preferred weekly industrial insurance, citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 151 (2000), for the proposition that the court should only "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses," (internal quotation omitted). Given that Maggie Norflet was already represented as "white" on the 1947 application, which plaintiff argues enabled the agent's earning a commission on the sale of industrial insurance, it is not clear what further incentive the agent would have to represent that Maggie Norflet preferred a weekly premium policy. However, a reasonable factfinder could infer, consistent with plaintiff's theory of the case, that because Maggie Norflet was identified as "white," the agent needed to justify his sale of an industrial policy to her, whereas he might not have made such a notation on the application of an African American identified as such on the form.

liberalization of its commission practices and the documents
demonstrating tracking of sales of industrial policies to African
Americans constitute direct evidence of intentional race
discrimination, not "speculation of discriminatory intent,
without any supporting evidence," as defendant contends.  See,
e.g. Bolton v. City of Bridgeport, 467 F. Supp. 2d 245, 254 (D.
Conn. 2006) (granting summary judgment to defendant where white
firefighter-plaintiffs failed to proffer evidence of race
discrimination in promotion testing in violation of 42 U.S.C. §
1983); Finney v. Planned Parenthood of N.Y. City, Inc., No. 02
Civ. 7942, 2003 WL 22928730, at *6 (S.D.N.Y. Dec. 10, 2003)
(granting defendant-employer summary judgment on § 1981, Age
Discrimination in Employment Act, and Title VII claims of 62-
year-old African-American plaintiff whose allegations of a plan,
practice, and pattern of discrimination were unsupported by
evidence).

C.  <u>Actual Damages</u>

In her amended complaint, Ms. Norflet demands declaratory and injunctive relief, including rescission, reformation, disgorgement (Count Three); imposition of a constructive trust placed on wrongfully obtained monies (Count Four); and punitive damages.[6]  Hancock argues that Ms. Norflet's claims fail because she is unable to prove actual injury entitling her to compensatory money damages.

It is axiomatic that "[compensatory money] [d]amages are properly awarded for civil rights violations when the plaintiff has suffered an actual loss as a result of a constitutional deprivation."  <u>Henry v. Gross</u>, 803 F.2d 757, 766 (2d Cir. 1986) (affirming compensatory damages award to plaintiff challenging legality of public assistance benefits program under New York state laws and 42 U.S.C. § 1988).  However, "a plaintiff who has proven a civil rights violation, but has not proven actual compensable injury, is entitled as a matter of law to an award of nominal damages," and may also be awarded punitive damages "if the defendant's conduct is shown to be motivated by evil motive

_____

[6] While plaintiff's Amended Complaint does not specifically demand compensatory damages, Norflet argues that if she can prove that her mother was qualified to purchase ordinary insurance at the time she purchased her industrial policies, then she would be entitled to compensatory damages, as well.

or intent, or when it involve reckless or callous indifference to the federally protected rights of others." Tolbert v. Queens College, 242 F.2d 58, 74 (2d Cir. 2001) (reversing trial court's grant of defendant's Rule 50(b) motion and reinstating nominal and punitive damages award under § 1981 and Title VI where evidence supported African-American student's allegations of race discrimination) (internal quotation marks omitted).

Hancock is correct that nominal and punitive damages may be awarded only where there is a proven civil rights violation, but as the Court has concluded that genuine issues of material fact on defendant's intent exist, it remains for the jury to determine whether Ms. Norflet's claims can be proven. Moreover, it is clear that Ms. Norflet's suit is not being prosecuted solely for purposes of compensatory monetary relief; she is seeking a variety of forms of relief for what she alleges to be a formal, systematic program of racial discrimination.


D.    Plaintiff's Rule 56(f) Argument

Lastly, Ms. Norflet argues that Rule 56(f) should prevent Hancock from prevailing, providing as it does that summary judgment may be denied where the non-moving party has not had a full opportunity to marshal facts in opposition.

Recognizing that "[t]he non-moving party must have 'had the opportunity to discover information essential to his opposition' to the motion for summary judgment," Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989), Rule 56(f) provides that when it appears from the affidavit of a party opposing summary judgment "that the party cannot . . . present by affidavit facts essential to justify the party's opposition, the court may . . . order a continuance to permit . . . discovery to be had." In the Second Circuit, a 56(f) affidavit must include four elements: "the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts; and why those efforts were unsuccessful." Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994).

Ms. Norflet has indeed submitted a Rule 56(f) affidavit, from attorney Fran L. Rudich. However, the affidavit is problematic for several reasons: first, it provides no specific information about how discovery on ordinary policies would help plaintiff respond to defendant's motion, see Trebor Sportswear, 865 F.2d at 512 (denying 56(f) discovery where plaintiff failed to show how further discovery would yield information germane to "the nub of the [defendant's] motion for summary judgment"). Second, as to the fourth Paddington requirement, while the Court

20

stated at the April 24, 2006 status conference that in discovery "we're looking at only industrial life and we are looking at whatever the merits of the individual plaintiff's case is" (Apr. 24, 2006 Tr., Pl. Opp. Ex. A, at 37), neither side appears to have taken the Court's remark as laying down a bright-line rule cordoning off discovery relating to ordinary policies, as showed by the exchanges between the parties on disclosure of information related to ordinary policies.  In one such exchange, defense counsel Waldemar Pflepsen responded to plaintiff's counsel Cyrus Mehri's query about further discovery on the subject of ordinary policies by noting that Hancock had already disclosed policy forms, related correspondence, collective bargaining agreements, sales agents' reference manuals, annual reports, and triennial examination excerpts related to ordinary policies.  Nov. 17, 2006 letter, Def. Opp. to Pl. 56(f) Request Ex. 2.  Hancock's corporate witness Barry L. Shemin was deposed in detail about the nature of ordinary policies, their relationship to industrial policies, and Hancock's sale of them, see Shemin Dep., Def. Opp. to Pl. 56(f) Request Ex. 3, at 65-67, 70, 187.  Additionally, both parties' expert reports disclose comparisons of ordinary and industrial insurance.

Perhaps most significantly, while plaintiff's counsel represents that he did not understand the significance of

possessing further information on ordinary policies until the summary judgment stage, the centrality of the ordinary-industrial policy comparison was already present in the Amended Complaint and was prominent in the briefing on defendant's motion to dismiss as well as plaintiff's motion for class certification. Of course, there is no suggestion that Ms. Norflet tarried in pursuing discovery, see Burlington Coat Factory Warehouse Corp. v. Esprit de Corp., 769 F.2d 919 (2d Cir. 1985) (denying 56(f) relief where plaintiff delayed discovery), but she has failed to remedy any inadequacy in discovery on the subject of ordinary insurance, a subject which was front and center as Hancock's arguments in opposition to the class certification came into focus, Trebor Sportswear, 865 F.2d at 512 (denying 56(f) relief where plaintiff had ample time for discovery).

Because plaintiff has failed to demonstrate via affidavit and supporting materials that she should be entitled to further discovery in order to oppose defendant's Motion, see Meloff v. N.Y. Life Ins. Co., 51 F.3d 372 (2d Cir. 1995) (vacating grant of summary judgment where plaintiff's 56(f) affidavit demonstrated defendant's obstructive, dilatory responsiveness to discovery requests), her 56(f) request is denied.


IV.  Conclusion

22

Accordingly, defendant's Motion for Summary Judgment [Doc. # 128] is DENIED.

IT IS SO ORDERED.

_____

JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 6th day of September, 2007.**